UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

UNITED STATES OF AMERICA, ex rel.,
PETER GOLDMAN,

                    Plaintiff/Relator,

v.

SYMPHONY DIAGNOSTIC SERVICES NO.
1, LLC, d/b/a MOBILEXUSA,

                    Defendant.

_____/

**Filed Under Seal Pursuant to
31 U.S.C. §3730(b)(2)**

Case No. _____

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730)

On behalf of the UNITED STATES OF AMERICA, Plaintiff/Relator Peter Goldman (hereinafter "Relator"), hereby files this qui tam Complaint against Defendant, SYMPHONY DIAGNOSTIC SERVICES NO. 1, LLC, d/b/a MOBILEXUSA (hereinafter "Defendant"), pursuant to 31 U.S.C. §3729, *et seq.*, to recover all damages, penalties, and other remedies available under the False Claims Act, and alleges as follows:

## I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.      This matter involves a significant fraud on the United States Government through knowing violations of the Anti-Kickback Statute.  The Defendant herein, Symphony Diagnostic Services No. 1, LLC, d/b/a MobilexUSA (hereinafter "Defendant") along with various skilled nursing facility customers (hereinafter "SNFs") knowingly and intentionally entered into kickback arrangements that greatly enriched Defendant and allowed the co-conspirator SNFs to increase their profit margins on daily patient services.

2.      Defendant offered discounted services to Medicare Part A, C (aka Managed Care) and VA patients residing in SNFs to include mobile diagnostic services such as X-Rays, EKGs and Ultrasounds.

3.      Normally, SNFs would be responsible for the entire cost of radiological services provided to patients.  SNFs are paid on a flat, per diem rate that is designed to cover **ALL** costs related to services furnished to Medicare Part A, C and VA patients in a rehabilitative setting.  This is often referred to as a capitated rate and CMS builds into the rate these anticipated services.

4.      A SNF benefits from this swapping arrangement by paying less for medical services provided to their patients that typically include X-Rays, Ultrasounds, EKGs and laboratory work.

5.     This type of discount arrangement is known as "swapping" and violates the provisions of the Anti-Kickback Statute.  These arrangements create an unfair marketplace where fair competition is hampered, fraud perpetuates more easily and payors like CMS suffer.

6.     In one instance, Defendant billed SNFs a mere $0.75 cents per patient, per day, to perform as many X-Rays as necessary for Medicare and VA patients.  This resulted in a huge savings to the SNFs as the cost of one mobile X-Ray is more than $300.  Defendant also offered other services such as EKGs and Ultrasounds at a fixed, reduced cost.  In return for this inducement, SNFs allowed Defendant to exclusively perform all Part B services to residents of the SNFs.  Defendant would bill Medicare directly for reimbursement of Part B services.

7.     Medicare providers are encouraged to be prudent buyers of services by seeking to minimize costs and refusing to pay more than the going price for a service.  Defendant took advantage of this arrangement by offering discounts on medical services that competitors could not match.  Their agreements with SNFs were below-cost rates and essentially hidden from Medicare.  Defendant knew that the federal government lacked the ability to track this type of fraud.

As laid bare throughout this complaint, Defendant knew fully well that numerous contracts it acquired were tainted with swapping provisions, yet chose to keep them in place rather than correcting them.  Absent an insider like Mr. Goldman coming forward, it was unlikely to have ever been discovered by The Centers for Medicare & Medicaid Services ("CMS") which administers the Medicare and Medicaid programs.

## II.    PARTIES

### A. Relator

8.    Under the FCA, a person with knowledge of false or fraudulent claims against the government may bring an action on behalf of the government and themselves.

9.    Relator is the original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

10.    Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2)

11.    Peter Goldman is a resident of Frisco, Texas.  Mr. Goldman has more than 18 years of experience in sales and marketing and is well versed in sales negotiations, credit and account management, customer relations management and sales presentations.  He is currently employed by Defendant as the Regional Sales Manager for the Southwest region that encompasses the states of Texas, Oklahoma, Arkansas and Louisiana.

### B. Defendant

12.    Defendant Symphony Diagnostic Services No. 1, LLC is registered with the California Secretary of State as a limited liability company with a business address of 930 Ridgebrook Road in Sparks, Maryland 21152.

13.    MobilexUSA is registered as an assumed name of Symphony Diagnostic Services No. 1, LLC by the Maryland Secretary of State.  Symphony Diagnostic Services No. 1, LLC also lists TridentUSA Health Services as an assumed name that was registered by the State of Texas. Defendant has operated under all of the above named entities at various times.

### C. SNF Co-Conspirators

14.     In addition to the Defendant itself, the other side of the illegal swapping agreements features Skilled Nursing Facilities or SNFs.  Defendant has contracted with nearly one hundred skilled nursing facilities located in and around the Southwestern United States that have per diem, per patient rates ranging from $0.50 to $3.00.  Relator proffers the below three specific companies to more fully demonstrate the fraud.

   i.      **Cantex Health Care Centers II, LLC** is a Texas Limited Liability Company that was incorporated in November 2004.  Cantex owns and operates more than 30 skilled nursing facilities (SNF) in central and northern Texas.

   ii.     **Garrison Nursing and Rehab** is a located at 333 North FM 95 Garrison, Texas 75946.

   iii.    **Christian Care Senior Living Community** is located at 1000 Wiggins Parkway Mesquite, Texas 75150.  This facility is listed with the Texas Secretary of State as an assumed name.  The legal name of the entity is the Christian Care Centers, Inc.

## II.    JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court because Relator seeks remedies on behalf of the United States for multiple violations of 31 U.S.C. §3729.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. §1367(a).

17.     This Court has personal jurisdiction over Defendant, and is the proper venue for this matter because Defendant is based in this District, licensed to do business in this District and does business in this District.

## III.   THE NATURE OF THE CASE

18.     In early 2016, Relator became aware of agreements between Defendant and approximately 27 SNFs owned and operated by Cantex Health Care Centers II, LLC (hereinafter "Cantex") that were located in central and northern Texas.

19.     Each Cantex facility had entered into a service agreement in May 2015 for radiology coverage with a Texas corporation named X-Ray X-Press.

20.     In November 2015, Defendant purchased X-Ray X-Press and assumed the agreements previously signed between the Cantex facilities and X-Ray X-Press.

21.     The service agreements laid out the radiology coverage that Defendant would perform for the Cantex SNFs which generally provided services to patients covered by Medicare Part A, C and Veterans (VA) insurance.

22.     Attached to each service agreement was a page titled "Schedule A- On-Site Services" that described the specific service to be provided and the cost of the services for all patients.  The four services provided by Defendant to the Cantex SNFs were:

- Mobile X-Rays to include transport, setup and performance;
- EKG transport, setup and performance;
- Mobile Ultrasound transport, setup and performance, and;
- Mobile ECHO transport, setup and performance.

23.     The billing for all X-Rays for Medicare Part A, C and VA patients was set at $0.75 per patient, per day.  The cost for EKGs and Ultrasounds for Medicare Part A, C and VA patients was a fixed rate of $75 and $100 per exam, respectively.  If Defendant performed an ECHO, all parties would pay the current Medicare rate or negotiated third party rate.

24.     Relator knew that the actual costs associated with performing mobile X-Rays were significant.  In addition to the technical equipment needed for X-Rays, Ultrasounds and EKGs, Defendant provided mobile transport, gas, insurance, the technician's salary and benefits, and other costs associated with providing mobile services.

25.     To offer X-Ray services as a loss leader at below-cost rates, Defendant would be required to produce significant revenues in other areas to break even, much less to make a profit.

Defendant made up for any losses in their Medicare Part A business by performing Medicare Part B services at partner SNFs.

26.   As part of Relator's efforts to determine the precise per diem rate paid by the SNFs, he obtained a listing of 27 Cantex SNFs that outlined the rate and the number of patient days on a monthly basis for the time period July 1, 2016 through September 30, 2016.  The following is an example of what one facility paid for an unlimited amount of X-Rays:

| Facility | Month | Description | Patient days at $0.75 | Amount Billed to SNF |
| --- | --- | --- | --- | --- |
| Ashford Gardens | 7/1/2016 | Medicare Part A | 448 | $336.00 |
| Ashford Gardens | 7/1/2016 | Managed Care | 94 | $70.50 |
| Ashford Gardens | 8/1/2016 | Medicare Part A | 376 | $282.00 |
| Ashford Gardens | 8/1/2016 | Managed Care | 126 | $94.50 |
| Ashford Gardens | 9/1/2016 | Medicare Part A | 316 | $237.00 |
| Ashford Gardens | 9/1/2016 | Managed Care | 205 | $153.75 |

27.   The total amount billed to Ashford Gardens for Part A and C (Managed Care) patients over three months was $1,173.75.  For the same time period, July 1, 2016 through

September 30, 2106, Defendant performed 22 X-Rays. Defendant could have billed Ashford Gardens $300 per X-ray for each of the x-rays performed for a total of $6,600. The overall savings to Ashford Gardens amounts to more than $5,000 in a single three month period.

28.     The scheme designed by Defendant and agreed upon by Cantex and other co-conspirator SNFs works in part due to how each provider is paid by Medicare.

29.     In the Balanced Budget Act of 1997, Congress established a Prospective Payment System (PPS) for SNFs. This permitted the Centers for Medicare and Medicaid Services (CMS) to provide advance payments to SNFs for skilled services to eligible patients. SNFs are reimbursed for services provided under the Medicare program on the basis of a per-diem (or daily) rate, which is determined, in part, by a patient classification system known as Resource Utilization Groups (RUGs).

30.     SNFs are part of the Medicare Part A hospital insurance (inpatient care) and are intended for patients who require a skilled level of care after a hospital stay of at least three days. SNFs also provide long term care for patients who are not eligible for, or who have exhausted their Part A benefit.

31.     SNFs are required to cover services that their patients require utilizing the daily amount they receive from Medicare. These services include X-Rays, Ultrasounds, EKGs, laboratory services, semi-private rooms, meals, general nursing care, drugs as required as part of the inpatient care along with any rehabilitation services ordered by a patient's physician such as speech, occupational and physical therapy.

32.     Medical services provided to long term care patients are typically billed to a patient's Medicare Part B coverage. Distinct from the Prospective Payment System, this is known as a fee-for-service payment system.

33.     By agreeing to enter into a swapping arrangement to minimize the costs for certain services, SNFs are able to keep more of the money that they receive from Medicare. In exchange, all they are required to do is permit Defendant to be the sole provider of mobile services to the SNF for any patients not covered by Medicare Part A.

34.     Many of Relator's co-workers questioned if the Cantex agreements were accurate as to fair market value. Relator questioned the high costs associated with performing mobile X-Rays in exchange for services at below-cost rates. Relator was aware of the actual amounts that Medicare would reimburse for mobile X-Rays.

35.     Relator had several discussions with management, including his direct supervisor David Pohl, about the per diem service agreements with the SNFs. Relator personally reached out to Cantex and discussed the price structure with them, but was told by the Regional Director of Operations for Cantex, Scott Givens, that Cantex did not want to alter the agreement.

36.     Defendant did not want to alter the agreement or upset Cantex because Cantex and Defendant were attempting to negotiate a similar agreement to handle Cantex' laboratory work.

37.     Relator attempted to convince David Pohl that the per diem, per patient rate of $0.75 was not legally compliant and that Defendant should renegotiate the agreement to a fixed price of at least $70 for X-Rays.

38.     Relator was told by David Pohl to do the best he could but, whatever he did, to not lose the Cantex business.

39.     Relator began by preparing a price comparison analysis for a new proposal for all of the 27 Cantex SNFs. The proposal eliminated the per diem, per patient rates and substituted them with a flat rate of $70 per X-Ray conducted. By doing this, the average per examination rate would rise from the then current rate of $40.02 to $70.

40.     Relator knew that even the average rate of $70 was still considerably less than what was allowable by Medicare, but was attempting to make a small change in Defendant's business model from per diem to flat rate. After several discussions with the corporate office and their review of Relator's new rates, Relator was told that Defendant would not change them and that status quo would persist.

41.     In comparison to the transport fee, the technical and professional costs associated with a mobile X-Ray were minimal. For example, Medicare reimburses a provider for a mobile chest X-Ray, one view and frontal at $302.37.[1] The breakdown of costs for this X-Ray is as follows:

| | |
|---|---|
| Technician Component | $13.28 |
| Professional Component | $9.37 |
| Set Up Component | $25.56 |
| Transport Component | $254.16 |

42.     Relator reviewed an internal analysis report for 27 Cantex SNFs for the time period July 1, 2016 through September 30, 2016. During this period, Defendant performed 1,414 medical services to include 245 ultrasounds, 28 employee exams and 1,141 X-Rays or EKGs. Defendant billed the 27 SNFs a total of $72,021.14 for these services. The payment to Defendant would have included 59,937 patient billing days (59,937 x $0.75 = $44,952.75), 245 ultrasounds ($25,256.60), an additional X-Ray/EKG expense of $407.79 and 28 employee X-Rays ($1,100). The 1,141 X-Ray and EKG exams resulted in a total charge of $45,664.54. When this amount is divided by the number of exams performed (1,141), the average cost of each exam is $40.02.

---

[1] The above pricing example is utilizing Medicare pricing for the state of Texas, Dallas region for 2016.

43.     In contrast, if the exams were billed out at a rate reflective of what Medicare typically reimburses ($300), the amount that could have been billed to the SNFs would be $342,300.

44.     Co-conspirators like Cantex thus reap a huge financial windfall by entering into swapping agreements.  However, at no point has Medicare reduced its costs or benefited from swapping arrangements between Defendant and SNFs.  One of the dangers in swapping is that the co-conspirator SNF becomes obligated to find Medicare Part B billing opportunities, regardless of necessity, to keep their mobile partner happy. This sits at the core of the Office of Inspector General

45.     In addition to the internal analysis that described the Medicare Part A services provided by Defendant to the 27 Cantex SNFs, Relator also reviewed the estimated revenue for each facility's Part A and Part B services.  This report which showed the benefit to Defendant by entering into the swapping arrangement.  For example, for the time period July 1, 2016 through September 30, 2016, Defendant billed Belmont at Twin Creeks SNF $3,496 for Part A services and also billed Medicare $8,965 for the Part B services they performed at the SNF.

46.     None of the above scheme is new to Defendant.  In fact, Defendant settled a similar case in June 2013 for falsely billing Medicare and Medi-Cal for laboratory and radiology services. Kan-Di-Ki, LLC, d/b/a Diagnostic Labs, LLC, and its parent, TridentUSA Health Services agreed to pay $17.5 million to settle allegations that Kan-Di-Ki violated the federal and California False Claims Act by paying kickbacks for referrals in the form of swapping arrangements.

47.     Central to the claims herein is the premise that at all times material, Defendant was aware that its per diem contracts with SNFs were in violation of HHS rules and regulations, yet, Defendant did nothing to change or alter them for fear of losing business.  Relator questioned

management on multiple occasions concerning the legality of entering into swapping arrangements with SNFs, as he had heard of similar arrangements throughout the company. Based on conversations with his superiors, most of the Defendant's management structure knew such agreements were illegal but they did not want to lose the contract or future business that came from these agreements.

## IV.   SPECIFIC EXAMPLES OF SWAPPING

48.     Relator provided the following examples to illustrate the impact of the swapping agreements between Defendant and SNFs:

### A. The Manor at Seagoville – November 2016

49.     Defendant submitted an invoice dated December 7, 2016 to the Manor at Seagoville (Seagoville) for services provided by Defendant for the month of November 2016. Seagoville was billed $138.75 for services provided by Defendant. The invoice identified the per diem, per patient amounts for patients covered under Medicare Part A ($90.75) and for patients covered by Managed Care or Medicare Part C ($48.00). The invoice documented that X-Rays were performed on Medicare patient 001 on November 17, 2016 and on Medicare patient 002[2] on November 27, 2016. The total amount for these two procedures under normal Medicare reimbursement rates would have been $634.03. Based on the invoiced amount to Seagoville, the two X-Rays were included in the per diem, per patient rate of $0.75. Seagoville was able to save $495.48 by entering into the swapping arrangement with Defendant.

### B. The Manor at Seagoville – March 2017

50.     Defendant submitted an invoice to Seagoville dated March 31, 2017 for services provided by Defendant for the month of March. Seagoville was billed $277.50 for services

---

[2] Patient names have been anonymized but provided to the government in a pre-filing disclosure.

provided by Defendant. The invoice identified the per diem, per patient amounts for patients covered under Medicare Part A ($119.25) and for patients covered by Managed Care or Medicare Part C ($54.25) for a total of $172.50. Defendant also performed X-Rays for three employees of Seagoville and billed Seagoville $35 each for a total of $105. The combined per diem, per patient amount ($172.50) and the employee X-Rays ($105) equaled the total bill sent to Seagoville. Defendant performed X-Ray services on Medicare Part A patients 003, 004, 005 and 006, as well as on Managed Medicare patient 007. Defendant's listed costs on the invoice only showed the technical component and the setup fee which totaled $263.76. Defendant did not show the cost for the mobile transportation which would have added an additional $1,258.20 (5 x-rays x $251.64) and changed the total cost of services that Defendant could have billed the SNF to $1,521.96. Seagoville was able to save approximately $1,300 by entering into the swapping arrangement with Defendant.

### C. The Manor at Seagoville – October 2016

51.     Defendant submitted an invoice dated November 3, 2016 to Seagoville for services provided by Defendant for the month of October 2016. Seagoville was billed $113.25 for services provided by Defendant. The invoice identified the per diem, per patient amounts for patients covered under Medicare Part A ($90.00) and for patients covered by Managed Care or Medicare Part C ($23.25). The invoice documented that X-Rays were performed on Medicare Part A patients 007 and 008. The total amount for these two procedures was $461.97. Based on the invoiced amount to Seagoville, the two X-Rays were included in the per diem, per patient rate of $0.75. Seagoville was able to save more than $348 by entering into the swapping arrangement with Defendant.

### D. San Remo – Medicare Part B 9/30/2016

52.     San Remo offered rehabilitation services for Medicare Part A patients recovering from a hospital stay as well as patients needing long term care.  Medicare patients that reside at a long term care facility must use their Medicare Part B coverage (or other insurance) for medical services.  Defendant and San Remo entered into a swapping agreement that benefited San Remo by offering below market cost rates for mobile X-Rays, ultrasounds and EKGs.  This allowed San Remo to retain more of the per diem amount it receives from Medicare.  In return, Defendant was permitted to exclusively provide radiology services to Medicare Part B patients.  For the month of July 2016, Defendant performed 38 examinations covered under the $0.75 per diem, per patient swapping agreement.  The 38 examinations consisted of five ultrasounds and 33 X-Rays and/or EKGs.  In a radiology utilization report dated 7/1/2016 through 9/30/2016 that contained the patient name, the date of service, the type of examination, outcome and name of the radiologist, Defendant performed an additional 30 examinations in the month of July that were billed to a patient's Medicare Part B benefit.

53.     For the month of August 2016, Defendant performed 48 examinations covered under the $0.75 per diem, per patient swapping agreement.  The 48 examinations consisted of 11 ultrasounds and 37 X-Rays and/or EKGs.  The radiology utilization report for August showed that Defendant performed an additional 32 examinations that were billed to a patient's Medicare Part B benefit.

54.     For the month of September 2016, Defendant performed 40 examinations covered under the $0.75 per diem, per patient swapping agreement.  The 40 examinations consisted of 12 ultrasounds and 28 X-Rays and/or EKGs. The radiology utilization report for September showed that Defendant performed an additional 25 examinations that were billed to a patient's Medicare Part B benefit.

### E.  San Remo – Medicare Part B 3/31/2018

55.     A radiology utilization report dated January 1, 2018 through March 31, 2018, continued to show the benefits to Defendant and San Remo of the swapping arrangement.  For the month of January, Defendant performed 35 X-Rays, three EKGs, eight Ultrasounds and one ECHO for Medicare Part A and C patients.  The EKGs and Ultrasound were billed to San Remo at the agreed upon flat rate of $75 and $100, respectively.  The Echo was billed at the current Medicare rate.  The X-Rays were performed under the per diem, per patient rate and $639.75 was billed to the facility.  In return, Defendant performed an additional 31 X-Rays, Ultrasounds or EKGs and billed the patient's Medicare Part B benefit.

56.     In February 2018, Defendant performed 26 X-Rays, three EKGs and two Ultrasounds for Medicare Part A and C patients.  The EKGs and Ultrasound were billed to San Remo at the agreed upon flat rate of $75 and $100, respectively.  The X-Rays were performed under the per diem, per patient rate.  A total of $936 was billed to the facility for these services. In return, Defendant performed an additional 41 X-Rays, Ultrasounds or EKGs and billed the patient's Medicare Part B benefit.

57.     In March 2018, Defendant performed 38 X-Rays, four EKGs, four Ultrasounds and four ECHOs for Medicare Part A and C patients.  The EKGs and Ultrasound were billed to San Remo at the agreed upon flat rate of $75 and $100, respectively.  The ECHOs were billed at the current Medicare rate.  The X-Rays were performed under the per diem, per patient rate and $1,066.44 was billed to the facility.  In return, Defendant performed 26 X-Rays, Ultrasounds or EKGs and billed the patient's Medicare Part B benefit.

### F.  Christian Care Center – April 2018

58.     In March 2005, the Christian Care Senior Living Community (formerly known as the Christian Care Center) and Community Portable X-Ray, Inc. (Community Portable) entered into an agreement whereby Community Portable agreed to provide X-Ray and EKG services to Medicare Part A patients at a rate of $1.35 per patient, per day.  In exchange, Community Portable would exclusively perform radiology services to patients covered by Medicare Part B at the SNF. In approximately December 2015, Schryver Medical, LLC purchased Community Portable and assumed the contract signed between Community Portable and the Christian Care Center. Approximately one year later in December 2016, Schryver Medical, LLC merged with and/or was purchased by TridentUSA Health Services and all contracts fell under Defendant.

59.     Defendant submitted an invoice to Christian Care Senior Living Community dated April 30, 2018 for services provided by Defendant for the month of April.  The invoice identified 297 patient days billed at the per diem, per patient rate (297 x $1.35) totaling $400.95.  The invoice documented that X-Rays were performed 27 times during the month of April which did not include eight employee X-Rays.  The total cost for the 27 services totaled $5,632.33.  Christian Care was able to save more than $5,200 entering into the swapping arrangement with Defendant.

### G. Garrison Nursing Home and Rehab Swapping Agreement

60.     Garrison Nursing Home and Rehab (Garrison) entered into a swapping arrangement with Defendant on October 1, 2017.  The agreement was set at a rate of $1.50 per patient, per day and consisted of Defendant performing X-Rays to patients covered by Medicare Part A and Managed Care.  Defendant also would perform cardiac and ultrasound services to Medicare Part A patients at only the technical rate for this service.

### H. Other Defendant Facilities

61.     Defendant provided services to approximately 390 facilities spread out across the southwestern United States during the first quarter of 2016.

62.     An analysis of the facilities for the time period July 1, 2016 through September 30, 2016 determined that along with the 27 Cantex SNFs, Defendant had an additional 62 swapping agreements with other SNFs. Two facilities agreed to pay $0.50 per diem, per patient with the other faculties ranging from $0.60 to $3.00 per diem, per patient. In total, Defendant was providing services to almost one quarter (89/390) of its SNF clients at below cost rates in return for significant Medicare Part B business.

63.     Relator's efforts to convince Defendant to move away from swapping arrangements was met with consistent negative responses and refusal to make changes out of fear of losing business to a mobile provider that would provide their own swapping agreement.

## V.     DAMAGES TO THE GOVERNMENT

64.     Defendant and co-conspirators participated in fraudulent acts by entering into a swapping arrangement that greatly benefited both parties but not Medicare.

65.     Defendant and the co-conspirators hid the swapping agreements from Medicare that resulted in significant savings for the SNFs and increased revenue for Defendant.

66.     Tainted by these kickbacks, all services provided for under these agreements would be rendered unnecessary, subject to the fines and penalties of the Anti-Kickback Statutes. *See U.S. v. Rogan,* 517 F.3d 449, 451-52 (7th Cir.2008).

## VI.     THE FALSE CLAIM ACT (FCA)

67.     The FCA, as amended, provides in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

68.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VII.   THE FEDERAL ANTI-KICKBACK STATUTE

69.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits knowingly and willfully giving or receiving any payment—directly or indirectly, overtly or covertly, in cash or in kind—to induce or reward the referral or generation of federal health care business.

70.     The Anti-Kickback Statute (hereinafter AKS) prohibits the offer or payment of "anything of value" in return for referrals. A "thing of value" is defined broadly to include payment in kind. The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals. Under the AKS Statute both criminal and civil penalties apply, including civil monetary penalties, and the sanction of exclusion from federal health benefit programs.

71.     The AKS was enacted as a result of Congressional concerns that payments made in return for referrals would lead to overutilization, affect medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

72.    In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are *induced* by kickbacks. As amended by the Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. No. 111-148, § 6402(f), the AKS now provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

73.    According to the ACA's legislative history, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854. To the extent the Government would not have paid the claims had it known the truth about the kickback arrangement, the Government is damaged in the full amount that it paid on those false claims.

74.    The AKS has statutory and regulatory "Safe Harbors" that identify specific arrangements that do not violate the statute if all terms of the Safe Harbors are observed by the parties. These provisions exist in order to provide safe harbors for contractual relationships that, while common, are particularly susceptible to abuse. For example, there is a regulatory safe harbor that may apply in certain discounts to providers who submit cost reports as long as they are given at the time of sale in an arms-length transaction; are fully disclosed by the provider to the United States in the cost report; and are fully and accurately reported by the seller to the provider in a written statement that advises of the provider's obligation to disclose to the United States.

75.    However, the safe harbor does not apply to supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same

methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology.

76.     When contracting parties like the SNFs at issue herein, are in a position to direct a significant amount of non-discounted federal healthcare program business (Ex. Part B) to a provider or supplier like Defendant, there is a heightened degree of scrutiny when they enter into agreements below fair market value.

77.     In addition, when discounted prices provided to contracting parties are below the provider or supplier's costs there is a heightened degree of scrutiny as to whether the services are unlawful remuneration under the AKS.

## VIII.   MEDICARE COST REPORTING AND CLAIMS PROCESSING

78.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

79.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services (CMS), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

80.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

81.     There are two primary components to the Medicare Program, Part A (and Part C or Managed Care) and Part B.  Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, home health care and hospice. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve both Parts A and B for services billed by the Defendants to Medicare.

82.     In order to get paid, a provider completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 also known as a CMS-1450 form for Medicare Part A and CMS-1500 form for Medicare Part B.  These forms contain patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the UB-4/CMS-1450 and CMS-1500 to determine whether and what amounts a provider is owed.

83.     A key purpose of the forms is to protect the federal government from loss due to mistake or fraud.  Medicare has the right to audit all provider claims and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.

84.     However, while provider claims are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of claims submitted to them.  For these reasons, the Medicare billing system relies substantially on the good faith of providers to prepare and file accurate claims.

85.    To this end, the UB-04/CMS-1450 form contains the following warning:

THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL AND MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S). SUBMISSION OF THIS CLAIM CONSTITUTES CERTIFICATION THAT THE BILLING INFORMATION AS SHOWN ON THE FACE HEREOF IS TRUE, ACCURATE AND COMPLETE. THAT THE SUBMITTER DID NOT KNOWINGLY OR RECKLESSLY DISREGARD OR MISREPRESENT OR CONCEAL MATERIAL FACTS.

86.    In order to get paid from Medicare, providers, like Defendant and the co-conspirators, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS-1450.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS-1450 to determine whether and what amounts the provider is owed.

87.    That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

**CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)**

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

88.     To this end, the Health Insurance Claim Form, CMS 1450, contains the following

certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and
> necessary for the health of the patient and were personally furnished by me or were
> furnished incident to my professional service by my employee under my immediate
> personal supervision, except as otherwise expressly permitted by Medicare or
> CHAMPUS regulations.

That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment
> from Federal funds requested by this form may upon conviction be subject to fine
> and imprisonment under applicable Federal laws.

## IX.    CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

89.     To participate in the Medicare Program, a health care provider must also file a

provider agreement with the Secretary of HHS.  42 U.S.C. § 1395cc.  The provider agreement

mandates compliance with certain requirements that the Secretary deems necessary for

participating in the Medicare Program and for receiving reimbursement from Medicare.

### A. Medical Necessity and Appropriateness Requirements

90.     One such important requirement for participating in the Medicare Program is that

all Medicare claims may be submitted only when medical goods and services are (1) shown to be

medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C.

§ 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

91.     Various claims forms, including but not limited to the Health Insurance Claim

Form, require that the provider certify that the medical care or services rendered were medically

"required," medically indicated and necessary, and that the provider is in compliance with all

applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42

C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct

and supported by documentation and treatment records. *Id.; see also,* 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

92.    The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**B.  Obligation to Refund Overpayments**

93.    As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. *See also* 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

94.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. And, CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

**X.    CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Federal False Claims Act 31 U.S.C. §3729(a)(1)(A)**
**Presentation of False Claims**

95.    Plaintiff/Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 94 of this Complaint as if fully set forth herein.

96.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant knowingly caused the submission of false or fraudulent claims to the Medicare program.

97.    Defendant has knowingly presented or caused to be presented false or fraudulent claims to Federal and state healthcare programs for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

98.    As a result of its offering and paying kickbacks to induce health care providers to purchase, order, or recommend the purchasing or ordering of Defendant's services, in violation of the federal anti-kickback statute, 42 U.S.C. §1320a-7b(b), Defendant caused the health care providers to present claims to the government for reimbursement to Medicare and Medicaid that were false or fraudulent.

99.    By reason of the false or fraudulent claims that Defendant knowingly caused the health care providers to present to Medicare and Medicaid, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

100.    The United States, or its authorized agent, and in reliance on these false and/or fraudulent claims, paid the false and/or fraudulent claims.

101.    Had the United States known of Defendant's kickback scheme by, it would have refused to authorize payment for services provided by Defendant.

102.    By virtue of the false or fraudulent claims Defendant knowingly caused to be presented, the United States has suffered substantial monetary damages.  Accordingly, Defendant knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(l) (2000), and, as amended, 31 U.S.C. §3729(a)(l)(A).

**SECOND CAUSE OF ACTION**

**Federal False Claims Act 31 U.S.C. §3729(a)(1)(B)**
**Making or Using False Record Statement to Cause Claim to be Paid**

103.     Plaintiff/Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 94 of this Complaint as if fully set forth herein.

104.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendant knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. §3729(a).

105.     Providers are required to submit annual cost reports to the Centers for Medicare and Medicaid Services, the agency that administers federal healthcare programs. 42 C.F. R. 413.20(b). Each cost report includes a certification attesting to compliance with healthcare laws and regulations, including anti-kickback provisions.   By engaging in kickbacks, Defendant knowingly caused the submission of false or fraudulent claims for payment to the United States, and knowingly caused the use of or reliance upon false statements, resulting in the payment of false or fraudulent claims. 31 U.S.C. §3729(a)(1) and (2).

106.     By virtue of the false records or statements Defendant made or caused to be made, the United States have suffered substantial monetary damages.

**THIRD CAUSE OF ACTION**
**Federal False Claims Act**
**Conspiracy pursuant to 31 U.S.C. § 3729(a)(1)(C)**

107.     Plaintiff/Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 94 of this Complaint as if fully set forth herein.

108.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendant conspired with unnamed Skilled Nursing Facility operators to make or present false or fraudulent claims and performed one or more acts to effect payment of false or

fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C), which conspiracy caused the United States to incur damages.

## XI. DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States of America, demands judgment against Defendant, ordering that:

a.  Pursuant to 31 U.S.C. §3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. §3729, *et seq*;

b.  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

c.  Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. §3729(d) and any other applicable provision of the law; and,

d.  Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Plaintiff/Relator hereby demands a trial by jury as to all issues.

Dated this 27th day of September, 2018.

Respectfully submitted,

BY:/S/William S. Heyman_____
    William S. Heyman, Bar No. 23036
    Heyman Law Firm
    201 N. Charles Street, Suite 1100
    Baltimore, MD 21201
    (410) 762-0141 Telephone
    (410) 762-0142 Facsimile
    wheyman@heymanfirm.com

    James D. Young (Pro Hac Vice to be filed)
    jyoung@forthepeople.com
    Sarah Allen Foster (Pro Hac Vice to be filed)

sfoster@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

*Attorneys for Plaintiff/Relator*

JS 44 (Rev. 08/18)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

United States of America, ex rel., Peter Goldman

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
William S. Heyman 201 N. Charles Street, Suite 1100
Baltimore, MD 21201
410-762-0141

### DEFENDANTS

Symphony Diagnostic Services No. 1, LLC, d/b/a MobilexUSA

County of Residence of First Listed Defendant   Baltimore County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
Other:
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☒ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

### V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3730
Brief description of cause:
False Claims Act

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   9/27/2018

SIGNATURE OF ATTORNEY OF RECORD   _____   Bar No. 25036

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____